Filed 9/26/16  In re Michael V. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MICHAEL V. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D070148 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ13056B-C) |
| v. | |
| MARTIN V., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Martin V. appeals from an order terminating his parental rights to Michael V. and E.V. (together, the children) under Welfare and Institutions Code section 366.26.[1] Martin contends the court erred in denying his request to continue the contested section 366.26 hearing so that he could obtain a bonding study. Martin also contends insufficient evidence supports the court's finding that the children would likely be adopted. Finally, Martin contends the court erred in not applying the beneficial relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(i). We conclude the court did not err on any asserted ground and affirm the order terminating Martin's parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2014, the San Diego Health and Human Services Agency (the Agency) filed dependency petitions for Michael and E.V., who were ages two and 11 months respectively, based on the children's exposure to violent confrontations between Martin and their mother, Michelle R., and physical abuse inflicted on the children's older half brother.[2] (§ 300, subds. (b), (j).) The parents had a volatile relationship, used illegal drugs, had criminal histories, and were frequently unemployed. At the August 7, 2014 detention hearing, the juvenile court ordered the children detained in foster care, and they began living in the home of Sean and Charity R. (Caregivers) several days later.

---

[1]   All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]   Since Michelle is not a party to this appeal, we accordingly limit our factual recitation.

In October 2014, the court made true findings on the section 300 petitions and continued the children's placement with Caregivers. The court ordered the Agency to provide reunification services to the parents and supervised visits at least once weekly.

At the combined contested six-month and 12-month review hearing in November 2015, the juvenile court terminated reunification services for Martin, finding that he had not made substantive progress on his case plan. In several reports received by the court, the Agency noted Martin's reluctance to acknowledge protective issues, his controlling nature, his codependent relationship with Michelle, his argumentative and hostile attitude toward the Agency and other service providers, and his lack of insight into how domestic violence impacted the children. Although Martin completed various classes, went to group therapy, and could articulate some of what he had learned, he continued to engage in physical confrontations and altercations with Michelle, which were observed by third parties and/or reported by her. For example, in an August 2015 incident, Martin pulled Michelle's hair, broke her phone, and threatened her if she left him, causing her to stab him with a pen.

As for visitation, the Agency reported that Martin maintained generally consistent, weekly visits until June 2015, at which point he obtained a job and then missed a few visits due to work or feeling tired. In October 2015, he visited the children only once. Although Martin did not visit the children as often as he was permitted to, the Agency was more concerned about the quality of his visits. When he and Michelle visited the children together, they frequently argued with each other, raised their voices, and Martin

3

focused his attention on Michael and excluded E.V. On a recurring basis, Martin favored Michael over E.V.

On March 2, 2016, the court began a contested section 366.26 hearing. All parties were present, including Martin who was otherwise in jail for failing to register as a sex offender. Before trial could begin, Martin requested new counsel, and the court held a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118). The court denied Martin's *Marsden* motion, appointed him a guardian ad litem after finding that his current mental condition precluded him from rationally assisting his trial counsel, and rescheduled the hearing. The next day, Martin was released from jail. On April 4, the court held a pretrial settlement conference and confirmed trial.

On April 15, 2016, the court held the rescheduled contested section 366.26 hearing, two hours after the calendared start time. Martin was not present. His counsel requested a continuance, informing the court that he saw and spoke to Martin on April 6 at a different court hearing, and Martin wished the court to order a bonding study. In addition, counsel stated that Martin normally attended court hearings. His guardian ad litem joined in the request for a continuance. Counsel for the Agency and children argued there was not good cause for a continuance because Martin clearly had notice of the hearing since March 2, and the request for bonding study was too late and would prolong permanency planning. The court denied Martin's request, finding he had legal and actual notice of the section 366.26 hearing date, was absent by choice, and did not show good cause for a continuance. The court also found a delay would be against the children's best interests.

4

The court then proceeded to hold a document trial consisting of various Agency reports, reports prepared by a court appointed special advocate, and the social worker's resume. Regarding adoptability, the evidence showed Michael to be a generally happy, energetic, and playful three-year-old boy who had been diagnosed in early 2015 with microcephaly and neurocognitive and developmental delays in communication, motor skills, problem solving, and social skills. His developmental condition improved with a variety of therapeutic services, his vocabulary increased over time, he was doing well at a special preschool, and could recognize the first letter of his name. Michael had no urgent medical concerns, but had a 25 percent hearing loss in one ear and some dysmorphic body features that would require additional genetic testing. The Agency reported E.V. to be a happy and independent two-year-old, fully potty-trained, playful, and without developmental concerns. She attended preschool, was a "busy bee," and socialized well with her classmates. E.V. was in overall good health.

The Agency assessed both children to be generally and specifically adoptable. They were young and had plenty of attractive attributes. The Agency showed that six families in San Diego County were already approved to adopt a child matching Michael's characteristics and 61 families were approved to adopt a child matching E.V.'s characteristics. Moreover, four families in the County were approved to adopt a sibling set matching the children's characteristics. In addition, the children had been happily living with Caregivers for over 20 months. The caregivers had "[fallen] in love" with the children, grown very close to them, and wished to adopt. Indeed, the caregivers took the children on multiple family trips throughout the case rather than separate from them, and

5

diligently attended to all their needs, including their special developmental needs. The children were attached to Caregivers and referred to them as "mommy" and "daddy."

Regarding whether the beneficial relationship exception applied to Martin, the Agency's report for the section 366.26 hearing and addendum report dated April 4, 2016, described Martin's more recent visits with the children. Martin missed two scheduled visits in December 2015. During five visits observed by the Agency between December 2015 and February 2016, Martin generally behaved affectionately toward the children, but spoke unnecessarily and rudely to the social worker, requiring his redirection. The children separated from him without distress.

The Agency reported that on February 11, 2016, Martin became verbally aggressive with a staff person at the family visitation center (FVC) where his visits with the children were occurring. The FVC refused to monitor any more visits between Martin and the children because of Martin's escalating aggression and concern for the FVC staff's "safety." Between February 18 and March 4, Martin was incarcerated and did not visit the children. He cancelled scheduled visits on March 10 and March 17, and the Agency could not monitor the last two normally scheduled visits of the month due to staffing limitations and a holiday. The caregivers reported that the children's historically negative reactions to parental visits, including nightmares, sleep disturbances, and potty accidents, stopped when their visits with Martin stopped. The children were largely indifferent or unaffected when informed that their visits with Martin could not occur.

After considering the evidence and hearing counsel's arguments, the court found by clear and convincing evidence that the children would likely be adopted and were

6

generally and specifically adoptable.  Further, the court found the beneficial relationship exception to adoption did not apply, discussing how Martin had not regularly and consistently visited the children or developed a parent-child bond that would outweigh the benefits of adoption.  The court terminated Martin's parental rights and ordered the children placed for adoption.

## DISCUSSION

I. *The Court Did Not Err in Denying Martin's Request to Continue the Section 366.26 Hearing*

Martin contends the court abused its discretion and violated his due process rights by denying his request to continue the section 366.26 hearing so that he could be present at the hearing and to obtain a bonding study.  We disagree.

"Continuances are discouraged in dependency cases."  (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604.)  Courts may grant continuances only upon a showing of good cause and may not grant a continuance that would cause a hearing to occur beyond an otherwise required time limit if the continuance would be contrary to a minor's interest. (§ 352, subd. (a).)  In considering the minor's interests, the court must give "substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."  (*Ibid.*)  We review the denial of a continuance for abuse of discretion.  (*Giovanni F.*, at p. 605.)  To show abuse of discretion, the appellant must demonstrate the juvenile court acted in an "arbitrary, capricious or patently absurd

7

manner that resulted in a miscarriage of justice." (*In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)

Furthermore, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 (*Richard C.*) [affirming juvenile court's denial of a motion for bonding study made after termination of reunification services].) In *Richard C.*, the mother argued a bonding study would show that her children would benefit from continuing their relationship with her and establish an exception to termination of parental rights. (*Richard C.*, at pp. 1193-1194.) The court discussed how bonding studies after the termination of services are typically inconsistent with the statutory scheme of dependency law, would "frequently require delays in permanency planning," and due process did not require one under the circumstances. (*Id.* at pp. 1195-1197.) After terminating services, " 'the focus shifts to the needs of the child for permanency and stability,' " and courts must hold a section 366.26 hearing within 120 days to select a permanent plan. (*Id.* at p. 1196.)

In light of the foregoing principles, we conclude the juvenile court did not abuse its discretion in denying Martin's request to continue the section 366.26 hearing nor did it violate his due process rights. It is undisputed Martin had legal and actual notice of the hearing. There was no evidence before the court that he was incapable of attending the hearing. The court properly declined to speculate regarding his whereabouts and

8

concluded he voluntarily chose not to attend. (See *Young v. Redman* (1976) 55 Cal.App.3d 827, 832.)

In addition, the court reasonably declined to continue the section 366.26 hearing based on Martin's belated request for a bonding study. (*Richard C.*, *supra*, 68 Cal.App.4th at p. 1197 ["The Legislature did not contemplate such last-minute efforts to put off permanent placement."].) Martin could have earlier requested such a study, since the Agency's reports were available to him throughout the case, he had known since May 2015 that the Agency recommended termination of services, and the court terminated his services in November 2015. By the April 2016 hearing, the court found that a continuance would not be in the children's best interests, considering their need for stability and permanency. Also, the court already rescheduled the hearing once to give Martin time to confer with his guardian ad litem. Martin has not shown an abuse of the juvenile court's discretion.

II. *The Court Did Not Err in Finding That the Children Were Adoptable*

Martin next challenges the sufficiency of the evidence to support the court's adoptability finding. He argues: (1) the children were not generally adoptable because Michael's developmental and medical issues made it difficult for him and E.V. to be adopted together; and (2) Caregivers, who wished to adopt the children, did not have an approved home study.

A. *Guiding Principles*

The court can terminate parental rights only if it determines by clear and convincing evidence the child is likely to be adopted within a reasonable time. (§ 366.26,

9

subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) In determining adoptability, the focus ordinarily is on whether a child's age, physical condition, and emotional state will create difficulty in locating a family willing to adopt the child as an individual. (*In re I.I.* (2008) 168 Cal.App.4th 857, 872.) The possibility a child may have future problems does not mean the child is not likely to be adopted. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223-225.)

A child considered to be adoptable need not be in a prospective adoptive home, and there need not be a prospective adoptive parent " 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) Nevertheless, "the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*Id.* at pp. 1649-1650.) We review the court's finding as to adoptability for substantial evidence. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.)

If substantial evidence supports a finding the child is generally adoptable, we do not examine the suitability of the prospective adoptive home. (*In re R.C.* (2008) 169 Cal.App.4th 486, 493-494 (*R.C.*).) Only when the minor is not adoptable because of age, physical condition, or emotional state does the analysis shift from evaluating the child's characteristics to determining "whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of

the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062; *In re Valerie W.* (2008) 162 Cal.App.4th 1, 13.) As long as the minor is generally adoptable, the issue of a family's suitability to adopt is reserved for the subsequent adoption proceeding. (*R.C.*, at p. 494.)

B.      *Substantial Evidence Supports the Court's Adoptability Finding*

Here, the evidence showed the children were generally adoptable based on their positive personal attributes, their successful placement in a prospective adoptive home, and the interest of other prospective adoptive families. The children were young, happy, lovable, and generally healthy; Martin does not contend otherwise as to E.V. Although Michael had some dysmorphic features that would require additional genetic testing, his medical issues were well-documented throughout the case and highly manageable. For the most part, he engaged in typical three-year-old activities, including playing with cars, toys, and games. With therapy and special education, his developmental delays had greatly improved and would continue to improve. (Cf. *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062 [minor was not generally adoptable because he was completely developmentally disabled and required total care for life].) Neither child suffered from continuing emotional or behavioral problems. Michael's nature was "sweet" and "tender."

Moreover, the children were thriving in the home of Caregivers, who were fully aware of their needs, loved them, and were committed to adoption. Their willingness to adopt serves as further evidence the children were likely to be adopted within a reasonable time either by Caregivers " '*or by some other family*.' " (*R.C.*, *supra*,

11

169 Cal.App.4th at p. 491.) Should the placement with Caregivers fail, the Agency identified numerous families wishing to adopt Michael and E.V. separately, as well as four families willing to adopt a sibling set like the children—and not merely any siblings aged three and two, as Martin asserts. The Agency's research showed that Michael would be more difficult to place than E.V., yet its report concludes that "these children" would be adopted based on "several waiting families" willing to adopt them as a sibling group. Substantial evidence supports the court's finding that the children were generally adoptable.

Martin argues the children were not specifically adoptable because Caregivers had not been subjected to a home study. However, because substantial evidence supports a finding the children were generally adoptable, Caregivers' suitability to adopt was not a relevant inquiry. (*R.C.*, *supra*, 169 Cal.App.4th at pp. 494-495; *In re Sarah M.*, *supra,* 22 Cal.App.4th at p. 1650.) In any event, based on the record before us, Martin has not shown any legal impediment to adoption by Caregivers. His challenge to the court's adoptability finding fails.

III. *The Court Did Not Err in Concluding That the Beneficial Relationship Exception to Adoption Did Not Apply*

Martin lastly contends the juvenile court erred in concluding the beneficial relationship exception to adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) He argues he maintained frequent visitation with the children and they would benefit from continuing their relationship with him.

A.    *Guiding Principles*

At a section 366.26 permanency planning hearing, once the juvenile court finds by clear and convincing evidence a child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) One of these exceptions is the beneficial relationship exception to adoption, which applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

We apply the substantial evidence standard of review to the juvenile court's factual findings on the existence of a beneficial parental relationship and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395, citing *In re J.C.* (2014) 226 Cal.App.4th 503 and other cases.) When reviewing the sufficiency of evidence to support a finding, we "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

13

B.     *Substantial Evidence Supports the Court's Findings*

The juvenile court found that Martin did not maintain regular visitation with the children.  "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders."  (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  Based on our review of the record, there were several notable gaps in Martin's visitation, including periods when he was working or feeling tired, when the visitation center refused to monitor his visits due to his aggressive behavior, and when he was incarcerated.  He missed several visits in June 2015, visited the children only once in October 2015, and had not seen them for about two months preceding the section 366.26 hearing.  Martin periodically skipped other visits as well.  The juvenile court's finding that he did not engage in regular visitation with the children is supported by substantial evidence. (See *In re J.C.*, *supra*, 226 Cal.App.4th at p. 531 [irregular visitation when mother missed last five visits, habitually made last minute plan changes, and had other periods of inconsistency].)

Moreover, Martin did not demonstrate the children would "benefit from continuing" their relationship with him.  The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a

14

substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.)

To establish a beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-938 (*Jason J.*); *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The evidence must show more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly visitor' " (*Jason J.*, at p. 938). "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Here, substantial evidence supports the juvenile court's finding that Martin did not establish a beneficial parent-child relationship within the meaning of the statutory exception to adoption. The Agency's reports describe Martin's argumentative and

15

aggressive behaviors during visits that negatively impacted the children even if not directed at them. The children's negative reactions to visits stopped when Martin stopped visiting, and they were largely indifferent when he missed visits. He did not progress to unsupervised visits and continued engaging in domestic violence. The children were young, lived with Caregivers for a large portion of their lives, and their primary attachment was to Caregivers, who attended to all of their daily, health, and educational needs. Despite some positive visits with the children, Martin did not establish he occupied a parental role in their lives or they had the type of emotional attachment to him that would cause them great harm if his parental rights were terminated. (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

We accordingly conclude there is no merit to Martin's claim that the beneficial relationship exception to adoption applies in this case.

16

## DISPOSITION

The order terminating Martin's parental rights is affirmed.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

PRAGER, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17